VANDERGRIFF, SHERIFF, *v.* STATE *ex rel.*
DAVIS, COUNTY ATTORNEY.

SAME *v.* STATE *ex rel.* BAKER, DISTRICT ATTORNEY GENERAL.

(*Knoxville,* September Term, 1947.)

Opinion filed November 29, 1947.

HOBART F. ATKINS, of Knoxville, and WILLIAM O. GIL-
BREATH, A. L. FOX and THOMAS CHADWICK, all of Clinton,
for plaintiff in error.

HOWARD H. BAKER, District Atty. Gen., of Huntsville,
SIDNEY DAVIS, Co. Atty., of Clinton, and L. C. ELY, of
Knoxville, for defendant in error.

MR. JUSTICE PREWITT delivered the opinion of the Court.

These two ouster suits were brought against the Sheriff
of Anderson County. By order of the court, the cases
were consolidated and heard together. A decree was
entered ousting the Sheriff from office after a full hearing.
A jury was demanded and impaneled and eight issues
were made up under the direction of the court. All the
issues were withdrawn by the court from the jury except
two:

(1) Did defendant fail to report liquor seized by him
as required by section 11225 of Williams' Code?

(2) Did defendant knowingly and willfully fail to do his
duty as such Sheriff as provided by section 1877 of Wil-
liams' Code, which is a part of the ouster law?

The defendant has appealed and assigned errors.

The record is large and the testimony contains nearly
one thousand pages. There has been much feeling shown

in this lawsuit. The case of the relators centers around what is known in the record as the Embassy Club, the Volunteer Club, and the V. F. W. Club; and the alleged failure of the Sheriff to report all liquor seized within five days of its capture, as provided by said section 11225 of Williams' Code.

Six of the eight issues, including issues charging corruption in office, such as the acceptance by the Sheriff of gifts and bribes, and unlawfully disposing of captured whisky, were taken from the jury and decided in favor of the defendant.

It appears that whisky was sold regularly at the Embassy Club, which was situated near the Knox County line in Anderson County. Oak Ridge is located in Anderson County, and the huge war plant at Oak Ridge, and near there, covers thousands of acres of land in Anderson and Roane counties. Fifty to sixty thousand people were employed at the war plant in 1946; otherwise Anderson County is about the average size county in Tennessee. No doubt this well-equipped club was erected primarily to serve this largely populated area. To say the least of it, intoxicating liquors were sold there some time before these suits were brought. Some months before these suits were filed, this club was padlocked at the instance of the county attorney. It appears that the Sheriff and his deputies raided this place four or five times before it was padlocked but no liquor was found. Relators insist that this is a circumstance which goes to show that the operators had some sort of advance information as to when the raids would take place. It further appears that some time before the Embassy Club was padlocked, Highway patrolmen, headed by Commissioner Bomar, raided this club and seized a quantity of liquor.

The V. F. W. Club was operated by Veterans of Foreign Wars and was located near Clinton. This club was supposed to be operated for members only, but members were permitted to bring their guests with them. There is much evidence in the record to the effect that there were a number of slot machines in this club and that the Sheriff was notified of their presence and operation. Upon receiving this information, the record shows that the Sheriff immediately notified the operators of this club that these slot machines would have to be removed and they were promptly removed. The proof shows that these slot machines were out at this club about eleven weeks, but they were removed some months before these proceedings were instituted.

The Volunteer Club was located about three miles from Clinton in Anderson County and some 200 or 300 yards from the highway, where cockfighting was permitted and carried on. The Sheriff made several trips out there and testified that at no time while he was there was cockfighting engaged in. The record discloses that this club has ceased to function and was closed some months before the bills were filed in these cases.

Much testimony is directed at the failure of the Sheriff to report whisky seized by him as required by the statute. The Sheriff testified that he did not know it was his duty to report the captured whisky within five days after its seizure, but that he had in fact reported all whisky coming into his possession except some that was broken. He further testified that all whisky taken by him was marked and stored in the vault and it was locked. The charge is that numerous search warrants, which showed the quantity of liquor seized on the returns of the officers, were not to be found. Of course, it is the duty of the magistrate to file these warrants, or to send them to the circuit

court in proper cases; but relators seek to have an inference drawn from their absence that the Sheriff had something to do with their disappearance. There is nothing in the record to show that the Sheriff had anything to do with the disappearance of these search warrants.

The proof shows that when the defendant became Sheriff there was much bootlegging going on in the county as well as gambling. The proof further shows that in the eight months preceding the filing of the bills herein the defendant made numerous raids and captured several hundred gallons of whisky, including half pints, pints, fifths, and gallons. A considerable quantity of this whisky is unaccounted for as found by the trial judge, who removed the defendant from office. Relators insist that the defendant is accountable for the whisky and has violated the law. The defendant insists that all the contraband whisky was stored in the vault and it was locked.

It may be fairly inferred from the record that at least some of the defendant's deputies had access to this captured whisky. The proof shows that the defendant had over one hundred deputies, the greater number of whom were stationed at the Oak Ridge war plant and were paid by the Government. Some of the defendant's discharged deputies appeared as witnesses and testified against him.

The relators introduced several of the State highway patrolmen who testified about certain raids made in Anderson County, some on their own initiation and some in co-operation with the defendant; and it is significant to note that all of these officers gave defendant a good reputation, testifying that he had co-operated fully with the Highway Patrol and had made a good officer. Among those so testifying was George Burdett, Chief of the Highway Patrol of East Tennessee, located at Knoxville, in the adjoining county of Anderson. The witness Leonard

Frye testified that he lived in Maryville; that he was in the last war; that he was captain of the Field Artillery; that as captain of two units, he had the defendant under his command; that after 1942, the defendant was directly under his supervision; that he stayed under his supervision until July, 1945; and that he knew the defendant's reputation in his community. This witness also testified that the defendant's reputation for truth and veracity was of the highest. Numerous other witnesses testified to the good character and reputation of the defendant; in fact, there is no testimony otherwise.

The defendant testified in his own behalf and denied that he had ever misappropriated any of the seized whisky or handled it in any way unlawfully; that he did not know it was his duty to report the captured whisky within five days; that he had never accepted a gift or a bribe; that he knew it was against the law to accept a bribe and had never accepted one; and that he had honestly tried to enforce the law to the best of his ability. The defendant further testified that he had been hounded for months by his personal and political enemies, many of whom were law violators and some of whom were active participants in these proceedings to remove him from office. He denied that he ever refused or neglected to enforce the law or to make raids when the occasion presented itself.

The defendant was evidently affected on the witness stand by what had been going on for months preceding the filing of these suits. He was apparently much perturbed at times by counsel. Many of his answers to questions were not satisfactory by his answering, ''I don't know'' and ''Don't remember;'' but it must be said that in all of this heated controversy there is nothing to show that the defendant is not a man of integrity and of good character and reputation. When defendant was inducted

into office as Sheriff he had never held a public office before and was only twenty-five years of age. There is nothing in the record to show that he willfully refused to enforce the law.

■ Where a sheriff has made an honest and reasonably intelligent effort to do his duty, he will not be removed from office by the courts, though his efforts may not have been wholly successful, for his right to hold and continue in office depends upon the good faith of his efforts rather than upon the degree of his success. *State ex rel.* v. *Reichman,* 135 Tenn. 653, 188 S. W. 225, Ann. Cas. 1918B, 889.

■ The record in this case fails to show that the defendant has violated section 1877 of Williams' Code denouncing an officer "who shall knowingly or willfully misconduct himself in office, or who shall knowingly or willfully neglect to perform any duty enjoined upon such officer by any of the laws of the state, . . ."

While the record discloses that the defendant has made mistakes, we are not persuaded that it reveals that he has knowingly or willfully misconducted himself in office. The record further discloses that for a long time there has been much law violation in Anderson County. The great influx and increase in population may be to some extent accountable for this, but behind all this, defendant is shown to be a young man of integrity and good reputation.

■ Proceedings against an officer under the Ouster Act should never be brought unless there is a clear case of official dereliction, as such a drastic statute should be invoked only in plain cases and not for purposes of inquisition. *State ex rel.* v. *Bush,* 141 Tenn. 229, 208 S. W. 607.

■ The Ouster statute is a salutary one, but those administering it should guard against its overencroach-

ment. Shreds of human imperfections gathered together to mold charges of official dereliction should be carefully scanned before a reputable officer is removed from office. These derelictions should amount to knowing misconduct or failure on the part of the officer if his office is to be forfeited; mere mistakes in judgment will not suffice.

The judgment of the lower court is reversed and the case remanded.

All concur.

MR. CHIEF JUSTICE NEIL (concurring).

I have examined the transcript of the record in this case, including all pleadings, evidence, and the finding of facts by the trial judge. In the consolidated cases the defendant was charged with many acts of wilful misconduct in office, bribery, misappropriation of seized whisky, and/or failure to report it within five days after seizure, and that he knowingly and wilfully refused to enforce the criminal laws of the state. The defendant requested a jury to try the issues.

At the beginning of the trial the defendant's counsel submitted a number of special issues of fact, which embraced the above mentioned charges to be submitted to the jury. They were never submitted. The trial judge, at the conclusion of all the evidence, completely exonerated defendant of every accusation involving moral turpitude. A decree of ouster was entered upon two of the issues, as follows:

"Issue of Fact No. 4: 'Did he, the defendant Bernard F. Vandergriff, while Sheriff, and as such wilfully and knowingly fail to comply with section 11225 of the Code of Tennessee by failing to report to the Clerk of the Circuit Court of Anderson County, Tennessee, whiskey seized by him as such Sheriff.'

"Issue of Fact No. 6: 'Did he, Bernard F. Vandergriff, as such Sheriff, wilfully or knowingly fail to make arrests, or to cause raid to be made, or take other lawful means to suppress same, upon information received that certain persons were violating the law by retailing liquor and beer unlawfully, or possessing or operating gambling devices at their places of business, or otherwise violating the law.' "

The charge is made in the ouster petition that the defendant failed to make report of seized whisky within five days thereafter and from whom seized. The trial judge found as a fact that the audit of defendant's liquor reports showed a failure to account for 122 pints of whisky and three cases of whisky. He also found a failure to make report of other small amounts of whisky. The Court expressed the opinion that defendant knew he was to file such reports.

There is no doubt but that the defendant and his deputies seized large quantities of whisky. The Clerk of the Court stated she saw at least from 75 to 100 gallons poured out at one time. There is other proof to the effect that the jail was full of whisky. Some was turned over to the State Commissioner of Finance and Taxation and some sold by order of the court. The defendant contended he did not know he was to report seized whisky within five days, not that he was never to report it at all. I think the weight of the evidence is contrary to the Court's finding of fact, that is, that he wilfully and knowingly failed to make the report. He was no doubt very careless about it, but, considering the vast amount which he seized and did account for, there should be no order of ouster simply because what he actually seized failed to tally with warrants. There should be no condonation even of acts of official dereliction, but they are not a ground of ouster

unless the evidence shows his conduct to be wilful. If the sheriff was merely negligent in keeping his records, or by his negligence or that of his deputies some of the whisky disappeared and was not therefore reported, this is not such "wilful and intentional misconduct' as would justify his removal from office. Thus it was said in *State* v. *Reichman*, 135 Tenn. 685, at page 692, 188 S. W. 597, 599, Am. Cas. 1918B, 889:

"The inquiry always must be whether he has made an honest and reasonably intelligent effort to do his duty. If he has done this, the courts will not remove him, though his efforts may not have been wholly successful. In other words, his right to hold his office depends upon the good faith of his efforts rather than upon the degree of his success. *The fact that a few or many violations of the law have occurred in his county will never, without more, justify his removal.*"

I am convinced from a reading of the record that the evidence greatly preponderates against the second finding of fact, i.e., issue of fact number 6. The defendant was found to have "wilfully or knowingly failed to make arrests" or "*cause raids to be made*" upon information. I find that in no instance did he ever fail or refuse to serve any warrant lawfully issued and addressed to him.

The holding of this Court in the *Reichman Case, supra,* as to the duty of peace officers, and especially sheriffs, in suppressing every form of lawlessness, should not be departed from. Every peace officer in the state is thus advised as to his duties and responsibilities and no evasion of the law should be condoned or excused. This decision is, and should be, regarded as the controlling principle in every ouster proceeding against peace officers.

The admitted facts in the *Reichman Case*, however, are far different from what appears in the instant case. In

that case the sheriff contended he was under no duty to be a detective and discover violation of law; that he had no authority to arrest without a warrant unless the offense was committed in his presence, and that it would be unlawful for him to swear out a warrant. To this the Court strongly disagreed, responding in language that was unmistakable, holding:

"He is not a mere process server, but his duties require initiative on his part in the enforcement of laws against public offenses. It is therefore his duty to exercise the powers conferred upon him, and to use the means provided by law to accomplish the prevention and suppression of public offenses.

"He must use a reasonable degree of diligence to inform himself of conditions in his county, and will be derelict if he shuts his eyes to what is generally known in the community, or purposely avoids information, easily acquired, which will make it his duty to act.

"If he has notice of any public offense, it is his duty to act in its prevention."

The sheriff cannot close his eyes to crimes that are open and notorious, and refuse to act upon the theory that he must have a warrant for the suppression of every act of lawlessness not committed in his presence; nor can he evade his duty when he has information from a reliable source. Now in the *Reichman Case* there were saloons in Memphis almost without number, open and notorious, and operators were being permitted to pay a fine and continue in business. The sheriff did absolutely nothing to enforce the law except to serve process in injunction cases.

There is proof in the instant case that whisky was being sold in Anderson County in violation of law, especially at certain clubs such as V. F. W. Club, the Embassy, and some others, and that gambling (cockfighting) was going

on at the Volunteer Club. It is insisted by the relators that the defendant was advised of these law violations and that he failed and refused to act. The relators do not claim that he refused to apprehend offenders in every instance, in fact, it is not true, since he raided and made repeated arrests at one or more of these places. Some of them were closed by injunction under the nuisance act. When he heard that slot machines were being operated at the V. F. W. Club he notified the persons in charge that it would not be permitted and they at once desisted. There is proof in the record, and not denied, that many night clubs and roadhouses along the main highways had been closed by the sheriff.

I think it might be conceded that he did not make a raid or an arrest upon every occasion when information came to him of the violation of law. But this alone is insufficient to justify a judgment of ouster as there is no evidence of a wilful neglect of official duty. Adverting to the violation of law at the Embassy Club which was located on the highway between Clinton and Knoxville, and the alleged failure of the defendant to raid it, I find that Chief Burdett of the Highway Patrol testified as follows:

"Q. I will ask you if you don't know of your own knowledge that Mr. Vandergriff, Sheriff of Anderson County, didn't raid this same club (Embassy) a number of times with some of the Highway Patrol? A. Yes, sir.

"Q. And he has made every effort to your knowledge to clear up any law violations that might have been over there? A. Yes, sir."

It is shown by this witness, who was stationed nearby at Knoxville, that the defendant raided a number of places and was cooperative with the State Patrol. He asked the Chief for men to assist him in enforcing the law. The above testimony is not disputed. Of course, there was

law violation in Anderson County, just as there is more or less in every county. But the situation confronting the defendant when he went into office was most unusual. He had been in the army for four and one-half years. During that time the county's population had grown from a comparatively small number to where it required a great many officers to maintain order. The town of Oak Ridge had developed from a vacant field to a conglomerate population of 75,000 people. They came from everywhere and overflowed the countryside all the way from Harriman to Knoxville. Many of the employees lived as far away as fifty miles or more. A vast number lived in trailor cars. Naturally, there were many law violators who flocked to this area hoping to reap a harvest. This influx of people of unknown character, purpose, and origin, called for vigilance on the part of peace officers. I think it is remarkable that in these circumstances the defendant was able to prove, and did prove, that his record as sheriff was one of the best in the history of the county.

Now, with great deference to the able trial judge, I think he failed to properly apply the law to the facts shown in the record. There is no doubt the defendant failed to arrest some law violators. He was young, inexperienced, and in some degree was poorly advised. But I think he is not shown to have wilfully refused to enforce the law. The mere fact that he failed to arrest for some law violations, if he was acting in good faith, is not enough to justify his removal. As this Court observed in the *Reichman Case*, 135 Tenn. at page 692, 188 S. W. at page 599, Ann. Cas. 1918B, 889, "The fact that a few or many violations of the law have occurred in his county will never, without more, justify his removal."

In discussing grounds of ouster from office, Mr. Justice Cook said in *State ex rel.* v. *Perkinson*, 159 Tenn. 442, 19 S. W. (2d) 254:

"Proceedings under the Ouster Law should not be brought except in clear cases of official dereliction. The statute was intended to remove public officials for wilful misconduct and for acts involving moral turpitude."

For the foregoing reasons I feel constrained to concur in reversing and remanding the case.