STATE of Tennessee, ex rel. Tom P. THOMPSON, Jr., District Attorney General, Wilson County, Tennessee, Plaintiff–Appellee,

v.

Joseph G. WALKER, Laleta Shipper, and Allen Barry, Members of the Wilson County School Board, Defendants–Appellants.

Court of Appeals of Tennessee, Middle Section, at Nashville.

June 29, 1992.

Application for Permission to Appeal Denied by Supreme Court Nov. 30, 1992.

Jerry L. Smith, Deputy Atty. Gen., Nashville, for plaintiff-appellee.

William L. Harbison, Nashville, for defendant-appellant, Laleta Shipper.

Henry Clay Barry, Lebanon, for defendant-appellant, Allen Barry.

Ernest W. Cotten, Lebanon, for defendant-appellant, Joseph G. Walker.

Charles W. Cagle, Tennessee School Boards Ass'n, Nashville, for Tennessee School Boards Ass'n amicus curiae.

## OPINION

LEWIS, Judge.

This is an appeal by defendants[1], Joseph G. Walker, Laleta Shipper, and Allen Barry, duly elected members of the Wilson County Board of Education, from the judgment of the trial court that defendants be ousted from office instanter.

Appellant Shipper took office 1 September 1986 and appellants Walker and Barry took office 1 September 1988.

Members of the Wilson County School Board are required to have a high school education. They receive only token compensation for their time and services. The School Board's chief responsibility is to make policies for the school system, as a body representative of the public.

Wilson County has an elected full-time superintendent who oversees the day to day operation of the school system and manages its finances. In addition, the superintendent has a full-time staff to assist the superintendent in administering and managing all aspects of the operations of the school system.

School systems are audited each year by the State Comptroller's Office. The audits for the fiscal year 1988–89 and fiscal year 1989–90 revealed that the Wilson County School System had incurred a budget deficit of approximately two million dollars. The state auditors revealed several clerical and accounting mistakes that contributed to the deficit, including an overestimation of the average daily attendance by the superintendent's office, resulting in an overestimation of state funds for the school system; an increase in health insurance claims and clerical errors on payroll deductions for family coverage for employees;

1. Defendants shall hereafter be referred to individually by name or collectively as defendants.

and an improper accounting entry by the superintendent's office which made the books of the school system appear to show $800,000.00 more money than the system actually had.

The results of the audits for the 1988–89 and 1989–90 school years revealing these deficits were not available until the summer of 1990.

On 31 January 1991, the Wilson County Grand Jury, after having reviewed investigatory material from the State Comptroller of the Treasury and the Tennessee Bureau of Investigation, concluded that there were a number of serious problems with the Wilson County School System. The Grand Jury concluded that there was no criminal culpability on anyone's part, but that there had been a failure of management and supervision in the system. The Grand Jury requested the District Attorney to initiate ouster proceedings against school officials still in office.

On 15 February 1991, the District Attorney caused to be filed on behalf of the State of Tennessee on relation of the District Attorney, a complaint for ouster pursuant to Tennessee Code Annotated, Section 8–47–101, et seq., naming appellants as defendants.

Trial was held before a jury on 27 March—9 April, 1991, in the Wilson County Criminal Court. Following the jury findings as to questions of fact submitted to it, the trial court entered judgment that the appellants be ousted from office.

Tennessee Code Annotated 8–47–101 provides as follows:

**8–47–101. Officers subject to removal—Grounds.**—Every person holding any office of trust or profit, under and by virtue of any of the laws of the state, either state, county, or municipal, except such officers as are by the constitution removable only and exclusively by methods other than those provided in this chapter, who shall knowingly or willfully misconduct himself in office, or who shall knowingly or willfully neglect to perform any duty enjoined upon such officer or by any of the laws of the state, or who shall in any public place be in a state of intoxication produced by strong drink voluntarily taken, or who shall engage in any form of gambling, or who shall commit any act constituting a violation of any penal statute involving moral turpitude, shall forfeit his office and shall be ousted from such office in the manner hereinafter provided.

Each of the defendants testified that as members of the Wilson County School Board they were satisfied to leave the finances of the school system to the Superintendent of Schools. They also insist that their "good faith" in the carrying out of their duties as school board members should be a complete defense to the ouster proceedings. They insist that "good faith" is defined as an absence of an intention to violate the law. In relying on this defense, defendants cite and rely on *State ex rel. Estep v. Peters*, 815 S.W.2d 161 (Tenn.1991). We are of the opinion that *State ex rel. Estep v. Peters* is inapposite to the facts of this case.

*Estep* addressed the question of whether a county superintendent of schools who knowingly and willfully misapplied public funds without an intent to benefit personally may be ousted from office for this conduct under Tennessee Code Annotated, Section 8–47–101.

In *Estep*, the county superintendent, in order to cope with a deficit in the school system's budget, diverted federal funds designated for certain programs, bond proceeds for capital improvements, and contributions from an education employee benefit trust to the school's general purpose fund. *Estep*, 815 S.W.2d at 162. Nothing in the record shows that the superintendent in any way benefitted personally from the transfer. The superintendent's "misapplication of federal funds could have subjected him to federal prosecution pursuant to 18 U.S.C., Section 666(a)" even though the superintendent had no intent to benefit personally from the misapplication. 815 S.W.2d at 163. The Supreme Court upheld the Chancellor's judgment of ouster based on knowing or willful misconduct under Tennessee Code Annotated, Section 8–47–101, finding that the ouster was fully sup-

ported by the findings of the jury that the defendant "knowingly or willingly misapplied public funds and failed to make required financial reports to the Claiborne County Commission." *Id.* at 166. Unlike *Estep*, the issue in this case is whether the defendants "knowingly or willfully" neglected to perform their duties as school board members.

In order to remove an official from office for neglect, the neglect must have occurred "knowingly and willfully." Tenn.Code Ann., § 8–47–101. Neglect is generally defined as

2. **49–2–203. Powers and duties.**—(a) It is the duty of the local board of education to:

(1) Elect principals, supervisors, teachers, educational assistants, attendance officers, clerical assistants and other employees authorized by this title, and to fix salaries for such authorized positions according to the provisions of this title; and to make written contracts with all employees;

(A) No individual shall be elected to an interim contract unless the individual so elected is to fill a vacancy created by a leave of absence as set forth in § 49–5–702;

(B) All contracts with educational assistants will be for nonteaching positions;

(C) Educational assistants should be subject to direct supervision of certificated teachers when directly involved in the instructional program;

(D) No member of any local board of education shall be eligible for election as teacher, or any other position under the board carrying with it any salary or compensation;

(2) Manage and control all public schools established or that may be established under its jurisdiction;

(3) Employ janitors, engineers and such other persons as may be necessary to care for the school property, and to fix their compensation;

(4) Purchase all supplies, furniture, fixtures and material of every kind through the executive committee;

(A) All expenditures for such purposes estimated to exceed two thousand dollars ($2,000) or more shall be made on competitive bids, which shall be solicited by advertisement in a newspaper of general circulation in the county, except that the newspaper advertisement may be waived in the event of any emergency. School districts which have a purchasing division may use a comprehensive vendor list for the purpose of soliciting competitive bids; provided, that the vendors on such list are given notice to bid; and provided further, that such purchasing division shall periodically advertise in a newspaper of general circulation in the county for vendors and

to omit, fail, or forebear to do a thing that can be done, or that is required to be done, but it may also import an absence of care or attention in the doing or omission of a given act. And it may mean a designed refusal, indifference, or unwillingness to perform one's duty....

....

Failure to perform or discharge a duty, covering positive official misdoing or official misconduct as well as negligence. Black's Law Dictionary (6th ed.) p. 1032 (1990).

Tennessee Code Annotated, Section 49–2–203 [2] sets forth the powers and duties of

shall update the list of vendors following such advertisement;

(B) All purchases of less than two thousand dollars ($2000) may be made in the open market without newspaper notice, but shall whenever possible be based upon at least three (3) competitive bids;

(C) No county board of education shall contract for the construction of school buildings or additions to existing buildings, the expenditure for which is in excess of ten thousand dollars ($10,000) except when such contract be made after competitive bids. Public notice shall be given at least ten (10) days in advance of accepting bids for such construction, and the board shall award the contract to the lowest and best bidder. In the event no bid is within the budgetary limits set by the board for such construction, the board may negotiate with the lowest and best bidder to bring the cost of the construction within the funds available, with the approval of the commissioner of education;

(D) No board of education shall be precluded from purchasing materials and employing labor for the construction of school buildings or additions thereto;

(E) The provisions of subdivision (a)(4), (A), (B) and (D) shall apply to local boards of education of all counties, municipalities and special school districts;

(5) Order warrants drawn on the county trustee on account of the elementary and the high school funds, respectively;

(6) Visit the schools whenever, in the judgment of the board, such visits are necessary;

(7) Dismiss teachers, principals, supervisors, and other employees, upon sufficient proof of improper conduct, inefficient service, or neglect of duty; provided, that no one shall be dismissed without first having been given in writing due notice of the charge or charges and an opportunity for defense;

(8) Suspend or dismiss pupils when the progress or efficiency of the school makes it necessary;

(9) Have enumerated the scholastic population of the local school district in May of every odd-numbered year;

(10) Provide proper record books for the superintendent, and should the appropriate local legislative body fail or refuse to provide a suitable office and sufficient equipment for the superintendent, the local board of education may provide the same out of the elementary and the high school funds in proportion to their gross annual amounts;

(11) Require the superintendent and chairman of the local board to prepare a budget on forms furnished by the commissioner of education, and when the budget has been approved by the local board, to submit it to the appropriate local legislative body. No LEA shall submit a budget to the local legislative body that directly or indirectly supplants or proposes to use state funds to supplant any local current operation funds, excluding capital outlay and debt service. The provisions of the preceding sentence shall not apply to a newly created LEA in any county where the county and city schools are being combined for a period of three (3) years after the creation of such LEA. The county board of education shall submit its budget to the county legislative body no later than forty-five (45) days prior to the July term or forty-five (45) days prior to the actual date the budget is to be adopted by the county legislative body if such adoption is scheduled prior to July 1;

(12) Prepare, or have prepared, a copy of the minutes of each meeting of the board of education, and to mail a copy of such minutes, no more than thirty (30) days after the board meeting or at the time they are mailed to or otherwise provided to members of the board, if such is earlier, to the president of each local education association. Any subsequent corrections, modifications or changes shall be distributed in the same manner;

(13) Adopt and enforce, in accordance with guidelines prescribed by the state board of education pursuant to § 49-6-3002, minimum standards and policies governing student attendance, subject to availability of funds; and

(14) Develop and implement an evaluation plan for all certificated employees in accordance with the guidelines and criteria of the state board of education, and submit such plan to the state commissioner of education for approval.

(b) The local board of education shall have the power to:

(1) Make consolidation of two (2) or more schools when in its judgment the efficiency of the schools would be improved thereby;

(2) Require school children and any employees of the board to submit to a physical examination by a competent physician whenever there is reason to believe that the children or employees have tuberculosis or any other communicable disease, and upon certification from the examining physician that such children or employees have any communicable disease, to exclude them from school or service until such child or children, employer or employers, employee or employees, furnish proper certificate or certificates from the examining physician or physicians showing such communicable disease to have been cured;

(3) Establish night schools and part-time schools whenever in the judgment of the board they may be necessary;

(4) Permit school buildings and school property to be used for public, community or recreational purposes under such rules, regulations and conditions as may be prescribed from time to time by the board of education.

(A) No member of such board or other school official shall be held liable in damages for any injury to person or property resulting from such use of school buildings or property.

(B) The local board of education may lease buildings and property or the portions of buildings and property it determines are not being used or are not needed at present by the public school system to the owners and/or operators of private day care centers and kindergartens for the purpose of providing educational and child care services to the community. Such leases may not be entered for a term exceeding five (5) years and must be on such reasonable terms as are worked out between the school board and the owner and/or operator. No such leasing arrangement entered into in accordance with the preceding sentence shall be intended or used to avoid any school integration requirement pursuant to the fourteenth amendment of the United States Constitution. Otherwise public school buildings and property may not be used for private profit in counties of:

| not less than | nor more than |
| --- | --- |
| 77,700 | 77,800 |
| 85,725 | 85,825 |
| 319,625 | 319,725 |

according to the 1980 census or any subsequent federal census. The local board of education shall not execute any lease pursuant to this subdivision which would replace or supplant existing kindergarten programs or kindergarten programs maintained pursuant to the Minimum Kindergarten Program Law as contained in this title. The provisions of this subdivision shall also apply to municipal boards of education;

(5) Employ legal counsel to advise or represent the board;

(6) Make rules providing for the organization of school safety patrols in the public schools under its jurisdiction and for the appointment, with the permission of the parents of pupils as members thereof;

(7) Establish minimum attendance requirements or standards as a condition for passing a course or grade; provided, that such requirements or standards are established prior to any school year in which they are to be applicable, are recorded in board minutes and publicized through a newspaper of general circulation prior to implementation, and are printed and distributed to students prior to implementation; and provided further, that such requirements or

the local school board. The Board acts as a deliberative body and is charged with broad general policy-making powers. The Board sets teachers' salaries, approves contracts, hires and fires teachers and other employees, adopts and enforces minimum standards and policies and develops evaluation plans for employees.

Subsection 49-2-203(a)(11) provides that the Board shall:

Require the superintendent and chairman of the local board to prepare a budget on forms furnished by the commissioner of education, and when the budget has been approved by the local board, to submit it to the appropriate local legislative body. No LEA [local education agency] shall submit a budget to the local legislative body that directly or indirectly supplants or proposes to use state funds to supplant any local current operation funds, excluding capital outlay and debt service. The provisions of the preceding sentence shall not apply to a newly created LEA in any county where the county and city schools are being combined for a period of three (3) years after

standards shall not violate the provisions of § 49-6-3002(b).

(8) Provide written notice to probationary teachers of specific reasons for failure of reelection pursuant to this title; provided, that any teacher so notified shall be given, upon request, a hearing to determine the validity of the reasons given for failure of reelection.

(A) The hearings shall occur no later than thirty (30) days after the teacher's request.

(B) The teacher shall be allowed to appear, call witnesses, and plead his cause in person or by counsel.

(C) The board of education shall issue a written decision regarding continued employment of the teacher;

(D) Nothing contained herein shall be construed to grant tenure or the expectation of continued employment to any person.

(9) Offer and pay a bonus or other monetary incentive to encourage the retirement of any teacher or other employee who is eligible to retire. For purposes of this subdivision, "local board of education" means the board of education of any county, municipal or special school system;

(10)(A) Lease or sell buildings and property or the portions of buildings or property it determines are not being used or are not needed at present by the public school system to any governmental entity, civic group or community organization in such manner as is deemed by the board to be in the best interest of the school system and the community which the system serves. Otherwise, public school buildings and property may not be used for private benefit. In determining the best interest of the community, the board may seek and consider recommendations from the planning commission serving the community. No member of such local or county board or other school official shall be held liable in damages for any injury to person or property resulting from the use of such school buildings or property. No lease or sale shall be used to avoid any school integration requirement. A local board of education may also dispose of surplus property as provided in §§ 49-6-2006 and 49-6-2007, it being the legislative intent that a local board at its discretion may dispose of surplus property to private owners as well as civic or community groups as provided by this subdivision (b)(10).

(B) The provisions of this subdivision shall not apply in counties having a population of:

| not less than | nor more than |
| --- | --- |
| 77,700 | 77,800 |
| 85,725 | 85,825 |
| 319,625 | 319,725 |

according to the 1980 federal census or any subsequent federal census; and

(11)(A) Establish and operate before-and-after school care programs in connection with any schools, before and after the regular school day and while school is not in session. No Tennessee foundation program school funds or any required local matching funds shall be used in connection with the operation of these programs, but the board may charge a fee of any child attending a before-and-after school care program. In these programs, the board may use teachers on such extended program assignments as may be authorized by § 49-5-5209 and policies established pursuant thereto.

(B) Notwithstanding the provisions of any law to the contrary, with respect to all before-and-after school care programs and day care programs regulated by the department of education, the department shall:

(i) Enforce departmental standards which are identical to the licensing standards developed by the department of human services for before-and-after school care programs and day care programs respectively;

(ii) Perform on-site inspections of such programs no less frequently than on-site inspection of before-and-after school care programs and day care programs are respectively performed by the department of human services;

(iii) Require departmental employees who conduct on-site inspections of such programs to periodically participate in the training activities conducted by the department of human services for inspectors of day care programs; and

(iv) Not issue a waiver for any before-and-after school care program or day care program which fails to comply with departmental standards.

the creation of such LEA. The county board of education shall submit its budget to the county legislative body no later than forty-five (45) days prior to the July term or forty-five (45) days prior to the actual date the budget is to be adopted by the county legislative body if such adoption is scheduled prior to July 1.

No other part of Tennessee Code Annotated, Section 49–2–203, enumerating the powers and duties of the local boards of education expressly discusses the financing of local schools. There is no evidence in the record that the Wilson County School Board adopted unbalanced budgets in any of the applicable years. In each of the years in question the local legislative body approved the budget adopted by the school board. The school board has no power of taxation or power to appropriate funds for the operation of schools.

Tennessee Code Annotated, Section 49–2–204, provides that a school board member who votes to create debts beyond the income provided in the school budget for any school year or who misappropriates funds is guilty of a misdemeanor and "shall forfeit his office." We find nothing in the record which shows that the prosecution even attempted to establish that any board member violated Section 49–2–204. We find not even a scintilla of evidence in the record that any of the defendants were guilty of any criminal wrongdoing. The grand jury convened by the District Attorney concluded that no criminal wrongdoing was present.

Tennessee Code Annotated, Section 49–2–206(b)(4), provides that an executive committee made up of the chairman of the school board and the superintendent shall examine accounts and determine that the approved budget is not exceeded. The entire board does not have this duty.

The only other relevant statute cited to us, or that we are able to find, concerning school finances is Tennessee Code Annotated, Section 49–2–301. This statute defines the duties of the school superintendent. The superintendent of schools is required by Tennessee Code Annotated, Section 49–2–301, to meet certain standards of professional training, specifically including "school finance," in order to obtain a superintendent's certificate. Tenn.Code Ann., § 49–2–301(a)(2)(B)(iii). We find nothing in the statutes which require financial training for school board members. Tennessee Code Annotated, Section 49–2–301(f) provides in pertinent part that:

It is the duty of the board of education to assign to its superintendent the duty to:

. . . .

(4) Keep in well bound books, furnished by the board and arranged according to the regulations prescribed by the commissioner of education, a detailed and accurate account of all receipts and disbursement of the public school funds;

. . . .

(7) Have general supervision of all schools, . . .;

. . . .

(18) Report . . . the attendance;

(19) Make a written report, quarterly, to the appropriate local legislative body, for the board of education, of all receipts and expenditures of the public school funds, which accounts shall contain full information concerning the conditions, progress, and needs of the schools of the school system and which shall be audited by the appropriate fiscal officer and local legislative body;

. . . .

(21) Report to the local legislative body and the commissioner of education, whenever it shall appear to him that any portion of the school fund has been, or is in danger of being, misappropriated or in any way illegally disposed of or not collected;

. . . .

(23) Prepare, annually, a budget for the schools in his school system, to submit the same to the board of education for its approval and to present it to the county or other appropriate local legislative body for adoption as provided for by charter or private legislative act.

(24) Give his full time and attention to the duties of his position; . . . .

■ We are of the opinion that pursuant to the foregoing statute, the school board is required to assign all significant financial management duties to the superintendent. When and if the school system's finances are endangered, the superintendent is to report to the local legislative body, in this case the Wilson County Commission and the Commissioner of Education. Nothing in the statute requires the superintendent to report to the school board.

The school board must rely on the financial information prepared, compiled, maintained, and presented by the superintendent's office. Pursuant to Tennessee Code Annotated, Section 49-2-301(f)(19), the quarterly financial reports are to be prepared by the superintendent and these reports are to be audited by the appropriate fiscal officer and the local legislative body. To the extent that the prosecution's case was built on the superintendent's inaccurate quarterly reports, the prosecution was charging the defendants with violating duties expressly imposed on the superintendent of schools and the local legislative body, not on the school board.

In this instance the school board assigned the financial management of the schools to the superintendent of schools, exactly what was required of it by law. Defendants were charged with neglecting duties that did not belong to them. The duties belong to the elected superintendent of schools. Tenn.Code Ann., § 49-2-301.

A reading of this record shows that the prosecution's theory was based on the premise that the school board holds a position superior to the superintendent and is responsible for any mistakes that the superintendent or his staff may make. The District Attorney General, in his deposition, admitted that all the financial errors which caused the budget deficit were made in the superintendent's office.

■ The office of school board member is a "not for profit" office. *Boswell v. Powell*, 163 Tenn. 445, 447, 43 S.W.2d 495 (1931). The duties of the school board are imposed on the entire board and not on individual members. *Fine v. Stuart*, 48 S.W. 371, 375-76 (Tenn.Ch.App.1989). Courts have been and should be extremely reluctant to substitute their judgment for the judgment of the school board where the exercise of judgment does not violate some principle of law. *Mapp v. Board of Education*, 203 F.Supp. 843, 851 (E.D.Tenn. 1962). There is a presumption that actions of the school board are not arbitrary and capricious, but are reasonable and fair unless there is clear evidence to the contrary. *Mitchell v. Garrett*, 510 S.W.2d 894, 898 (Tenn.1974). Issues which come before the school board are usually matters of discretion and it is contemplated that the judgment of elected lay persons will control. There is a judicial reluctance to review the actions of school boards and this reluctance is appropriate.

We are of the opinion that the evidence in this record is clear that the budget shortfall in Wilson County is not the fault of the board of education. The statutes are clear. The budget starts with the superintendent and the management of the budget throughout the year remains the responsibility of the superintendent of schools. The board cannot authorize expenditures in excess of available funds, and there is no proof in this record that the Board knowingly or willfully authorized such expenditures.

We think that a reading of this record shows that the defendants acted in good faith in carrying out their duties, and that this is a factor to be considered in determining whether defendants' actions constitute knowing and willful neglect for the purpose of the ouster statutes. The District Attorney General testified in his deposition: "I think they (the defendants) would have if they realized what was going on, they would have done something."

■ Ouster suits should be brought only where the evidence of official dereliction is clear and convincing. *See, e.g., McDonald v. Brooks*, 215 Tenn. 535, 542, 387 S.W.2d 803, 806 (1965).

The ouster statute is a salutary one, but those administering it should guard against its overencroachment. Shreds of

human imperfections gathered together to mold charges of official dereliction should be carefully scanned before a reputable officer is removed from office. These derelictions should amount to knowing misconduct or failure on the part of the officer if his office is to be forfeited; mere mistakes in judgment will not suffice.

*Vandergriff v. State ex rel. Baker,* 185 Tenn. 386, 392–93, 206 S.W.2d 395, 397 (Tenn.1937).

The blame for the shortfall in the instant case rests on those responsible for the oversight of school finances. These are the superintendent of schools, Tenn.Code Ann., § 49–2–301(f)(21), the county commission, Tenn.Code Ann., § 49–2–301(f)(19), and the executive committee of the school board, Tenn.Code Ann., § 49–2–206(b)(4). Nothing in the statute places a responsibility for financial shortfalls on the school board as a whole or on the individual school board members.

We are of the opinion after a thorough review of this record that the defendants have not violated any of the duties assigned to them. The matters they were charged with violating are within the express duties of the superintendent of schools and not the school board. We are further of the opinion that there is no proof in this record that the defendants are guilty of any knowing or willful misconduct or knowing or willful neglect of duty as set forth in the ouster statutes.

We are therefore of the opinion that the judgment of the trial court should be reversed.

Because of our holding under this issue, we pretermit defendants' remaining issues. The cause is remanded to the trial court for further proceedings consistent with this opinion, and for the collection of costs, which are assessed to plaintiff-appellee.

TODD, P.J., and CANTRELL, J., concur.

