**Jane DOE and Janet Doe, Individually, Plaintiffs–Appellants,**

**v.**

**CLAIBORNE COUNTY, TENNESSEE, by and through the CLAIBORNE COUNTY BOARD OF EDUCATION; and Dennis L. Peters; Roy L. Norris; Charles Randall Burchette; Bobby Williams; Dr. Roy Ellis, Jr.; J.P. Barnard; Lynn S. Barnard; in their individual and official capacities; and Sam Widener; Don Dobbs, and James Leonard Bundren, in their official capacities only, Defendants–Appellees.**

No. 95–5050.

United States Court of Appeals, Sixth Circuit.

Argued March 21, 1996.

Decided Dec. 26, 1996.

Don C. Stansberry, Jr., Michael B. Kinnard, P. Edward Pratt (argued and briefed), Baker, Donelson, Bearman & Caldwell, Knoxville, TN, for Plaintiffs-Appellants.

James D. Estep, III, Estep & Estep, Tazewell, TN, Donald D. Howell (argued and briefed), Frantz, McConnell & Seymour, Knoxville, TN, for Claiborne County, Tenn.

Frank Q. Vettori (briefed), O'Neil, Parker & Williamson, Pamela L. Reeves (argued and briefed), Watson, Hollow & Reeves, Knoxville, TN, for Claiborne County Bd. of Educ.

Pamela L. Reeves, Watson, Hollow & Reeves, Knoxville, TN, for Dennis L. Peters, Don Dobbs, Roy Norris.

Frank Q. Vettori, O'Neil, Parker & Williamson, Knoxville, TN, for Sam Widener, Bobby Williams, J.P. Barnard, Randy Burchette.

Frank Q. Vettori, O'Neil, Parker & Williamson, William F. Alley, Jr. (briefed), Hodges, Doughty & Carson, Knoxville, TN, for Jeffrey S. Davis, Roy Ellis, Jr., Dr.

Elizabeth Adair Townsend (briefed), Baker, McReynolds, Byrne, Brackett, O'Kane & Shea, Knoxville, TN, for James L. Bundren, Lynn S. Barnard.

Before KRUPANSKY, RYAN, and NORRIS, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which KRUPANSKY, J., joined. NORRIS, J. (p. 516), delivered a separate opinion concurring in part and dissenting in part.

RYAN, Circuit Judge.

Plaintiff, Jane Doe, brought this civil rights action under 42 U.S.C. § 1983 against Claiborne County, Tennessee, the Claiborne County Board of Education, and several School Board members and school administrators in both their individual and official capacities. She alleges that she suffered damages as a result of being sexually harassed, abused, and ultimately statutorily raped by a school teacher, Jeffrey Davis, when she was a student. Doe also sued the County and the School Board for sexual harassment, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88, and brought a variety of state tort claims.[1]

The district court dismissed Doe's section 1983 claims, concluding that she presented no facts that showed defendants were deliberately indifferent to her constitutional right to bodily integrity. The court excluded Doe's "notice" evidence, which was crucial to her claims. Finally, the court dismissed Doe's Title IX sexual harassment claim against the County and the School Board on the grounds that Title VII agency principles do not apply to Title IX actions, and because Title IX does not reach the County. For the reasons explained below, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

### A.

### Factual Background: Jeffrey Davis's Abuse

At the time of the sexual abuse, Jane Doe was fourteen years old and a freshman at Claiborne County High School (CCHS), from which she graduated in 1994. Jeffrey Davis was a physical education teacher and coach at Soldiers Memorial Middle School (SMMS), and was the coach for the CCHS boys' baseball team. Before being hired for this position for the 1990–91 school year, Davis had been employed by the School Board as a boys' physical education teacher and basket-

---

1. This suit was originally brought by Jane Doe and her mother, Janet Doe. Janet Doe sued the defendants for extreme mental anguish, but her cause of action was dismissed and she has not appealed that decision to this court. Plaintiffs also pled causes of action under the Tennessee Governmental Tort Liability Act, which were dismissed by the United States District Court and the decision has also not been appealed to this

court. Davis, too, is no longer a party to this lawsuit. Although he was initially named as a defendant, when the district court dismissed all of Jane Doe's claims against the County, the School Board, and the board members and administrators, plaintiff moved under Fed.R.Civ.P. 41(a)(2) to dismiss Davis from the suit to facilitate this appeal.

We shall, hereafter, refer to Jane Doe as Doe.

ball coach at Midway School from 1987 to 1990.

Doe first met Davis during the spring of 1991 when she became a scorekeeper for the boys' baseball team. As a scorekeeper, she was required to travel by bus to the games with the team and the coach, Davis. Davis began systematically abusing and harassing Doe during these bus trips. At the team's first away trip, Doe sat next to Davis, who reached inside her blouse and fondled her breasts. She was "surprised" and "paralyzed" by the incident. She avoided Davis for the rest of the school year.

At the beginning of the 1992 school year, Davis started harassing Doe with telephone calls. He called her and asked her whether she would like to be the scorekeeper at the next boys' basketball game. Although nervous about riding with Davis on the bus once again, she acceded to his request. During the bus trip, Davis fondled her breasts for the second time. Davis then began telephoning Doe at home on a regular basis. He persuaded her to reciprocate the phone calls, but instructed her to call only when Davis's wife would not be home. The telephone conversations continued through the holiday break.

In January 1992, and for reasons not important to this litigation, Doe moved into her aunt's home. Davis persisted in telephoning Doe, increasing the calls to a daily basis. On one occasion, Davis kissed Doe on the mouth in the coaches' office at SMMS. On Valentine's Day 1992, Davis gave her a ring, and later the same month he suggested that they have sexual intercourse. Shortly after this proposal, during another bus trip, Davis touched Doe's vagina through her pants and made her touch his penis, also through his pants. One month later, Davis told Doe that he loved her.

In late March 1992, Davis took Doe to a trailer that belonged to friends of his and had sexual intercourse with her for the first time. This was Doe's first sexual experience and she suffered vaginal bleeding. They had sexual intercourse on five other occasions. Throughout these sexual encounters, Davis

and Doe continued their phone conversations, and Davis continued fondling Doe during bus trips.

The systematic sexual abuse of Doe came to an end in December 1992, when two of her aunts discovered her in Davis's home while his wife was away at the hospital giving birth to their child. Prior to that time, she never reported to anyone her ongoing relationship with Davis. Davis was subsequently charged with six counts of statutory rape and he tendered an *Alford*[2] plea to one count. Doe has been in psychological counseling since 1993.

## B.

### Defendants' Role

Doe sued Claiborne County "by and through" the Claiborne County Board of Education, Davis, and ten other defendants. She sued the following seven defendants in both their individual and official capacities: Dennis Peters, superintendent of schools until 1990 and principal of CCHS from 1990 to 1992; Roy Norris, superintendent of schools from 1990 to 1992; Bobby Williams, Chairman of the School Board; Charles Randall Burchette, Roy Ellis, and J.P. Barnard, members of the School Board; and Lynn Barnard, principal of SMMS. She also sued the following three defendants in their official capacities only: Sam Widener, member of the County Board of Education; Don Dobbs, interim superintendent of schools; and James Bundren, principal of Midway School.

Bundren was the principal of Midway School when Davis was first accused of misconduct. In the fall of 1989, while Davis was employed as a physical education teacher and the boys' basketball coach, the grandfather of an eighth-grade student contacted Bundren to complain about Davis touching his granddaughter in an inappropriate way, by placing his hand under her blouse. Bundren immediately called a meeting with Davis; Davis's supervisor, Dennis Peters, who was the superintendent at the time; the grandfather; and the girl's mother. At the conclusion of this meeting the girl's mother was satisfied

2. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

by Davis's explanation that nothing inappropriate had taken place, but in a follow-up conversation, she related to Bundren that she was considering referring the charge to the Department of Human Services (DHS) for investigation. In the meantime, Bundren advised Davis "not to be so friendly with [the] students." Bundren reported the results of the meeting to Widener, a member of the County Board of Education, and placed notes of the meeting in Davis's personnel file.

In January 1990, just a few months after the incident involving the eighth-grade student, DHS notified Peters that the agency had received information that Davis allegedly had sexually abused nine different girls at Midway School. In a letter to Peters, DHS stated that it was giving

> official notice that [DHS] is currently investigating reports of child sexual abuse molestation [sic] involving Jeff Davis of Midway School and several students in the Claiborne County School System.

> This preliminary information is being passed on to you as Mr. Davis still has access to children in his role as an educator.

> This letter is not meant to imply guilt or innocence but to inform you that an investigation is currently underway.

> Additional information will be provided to you after the completion of the investigation.

Two months after sending this letter, DHS sent Peters another letter informing him that Davis was still under investigation, that Davis had been informed of the ongoing investigation, that the information was confidential, and that "immediate action" needed to be taken to ensure that Davis would have "no access to or contact with any child" until further notice because he was named an alleged perpetrator of child sexual abuse. Midway School promptly removed Davis from student contact and placed him in the school's bus garage for the remainder of the school year. Davis was not rehired when the Board made its hiring decisions for the 1990–91 school year.

When Davis received the letter from DHS, he contacted Williams to inform him of the investigation. Peters, in turn, informed Widener and Bundren of the investigation, and Bundren discussed the matter with Widener.

Shortly thereafter, DHS concluded its investigation and informed Peters that it had determined that four of the nine allegations of child sexual abuse were "founded." Peters promptly notified the following parties of the results of DHS's investigation: Widener; Ellis, the superintendent who had made the decision to hire Davis; Burchette, Acting Board Chairman at the time; and Williams and J.P. Barnard, board members. The Executive Committee of the Board, consisting of the Chairman, Superintendent Peters, Widener, and Bundren, met to discuss the DHS findings. The record does not reveal the result of this discussion.

Shortly after this meeting, Peters was ousted from office because he misappropriated public funds and because a court entered judgment against him finding that he had violated the civil rights of school employees.

In the meantime, Davis requested a hearing with DHS to address the four "founded" charges of sexual abuse, but later waived this right. Instead, he negotiated what the parties term a "pre-trial agreement," which, summarized, provided that

> (1) DHS would not pursue any criminal proceedings against Davis, but that any criminal proceedings that the alleged victims would wish to pursue would have to be a matter to be decided by the local District Attorney General and the respective victims.

> (2) DHS would not place Davis's name on a registry because they had no control over the matter, but that the agency would not place Davis's name in *its* registry.

> (3) DHS would "not take any role" in seeking the suspension of Davis's teaching license, but that it would notify the appropriate school boards so that any further course of action would be up to them.

DHS sent a copy of this "agreement" to Peters. Although all defendants acknowledged knowing about the DHS agreement, only interim superintendent Dobbs, superintendent-elect Norris, and board member Steve Minton stated that they had seen the

agreement. Dobbs claims that he "interpreted the agreement to be an exoneration of Davis," and, because Davis was not employed by the Board during this time, Dobbs took no action other than to place the letter in Davis's personnel file. Dobbs, who is being sued in his official capacity only, served as superintendent for only two months: from July 1 through August 31, 1990, well before Davis was rehired and started abusing Doe.

Based upon promises made to Davis by acting chairman Burchette that the School Board would approve his rehiring, defendant Lynn Barnard, principal of SMMS, went to Davis's home during the summer of 1990 and offered him a position for the 1990–91 school year as a physical education teacher and coach at SMMS. As Davis started to explain the DHS charges, Barnard stated that he didn't "want to hear it." Contrary to school policy, Davis started working at SMMS in August 1990, prior to Board authorization of his employment. Barnard never consulted with Bundren about Davis's previous work history, or inquired into the allegations of sexual abuse. Although Barnard knew that DHS had requested that Davis be removed from student contact, he testified at his deposition that he believed Davis had been exonerated of all charges based on DHS's "pretrial agreement."

The Board met on September 13, 1990, and voted officially to hire Davis as a teacher at SMMS. Superintendent-elect Norris, who recommended Davis for rehiring, testified that he inspected Davis's file, interpreted the information contained therein as consisting of "unfounded" charges, and additionally asked SMMS Principal Barnard to confirm with DHS that the charges had been "dismissed." Prior to this meeting, the School Board had also met to rehire Peters as principal of CCHS.

Once the 1990–91 school year began, Barnard personally supervised Davis in light of the DHS charges and a "rumor" he had heard about Davis's "possible inappropriate behavior with a female student." On one occasion, Barnard observed Davis engaging in inappropriate behavior by "sitting on some gymnasium bleachers with two eighth-grade girls after a physical education class had been dismissed." He instructed Davis not to sit on the bleachers with the girls, but to send them back to the area where they belonged. On another occasion, a guidance counselor informed Barnard that a girl complained that Davis had suggested that they "get[ ] naked" while touching her on the ribs. Barnard contacted Norris about this allegation and also contacted DHS. DHS investigated this allegation and issued a finding of "unfounded."

Barnard continued a "close supervision" of Davis, including riding on the bus, on occasions, with the teams Davis coached. When the girls' basketball coach asked Barnard for permission to allow Doe to keep score for Davis's team, Barnard responded: "If you can't find anybody else. If we can't find anybody else." It is at this point that Davis began sexually harassing and abusing Doe.

## C.

### District Court Proceedings

Because this appeal presents a number of complex issues, we must set forth in detail the proceedings below. Doe sued Claiborne County, "by and through" the Claiborne County Board of Education, its board members, and school administrators, alleging that defendants had actual notice that Davis had a tendency to sexually abuse students. Doe asserted that their collective failure to remove Davis from student contact and their decision to rehire him for the 1990–91 school year showed a deliberate indifference to Doe's "safety, health and welfare," in violation of the Fourteenth Amendment of the United States Constitution. Doe also sued the County and the School Board for sexual harassment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88, on the grounds that Davis was an agent of the School Board and his conduct created a hostile sexual environment for Doe.

Doe's section 1983 claim alleged that the School Board had a "custom" of ignoring the unconstitutional behavior of its employees, as evidenced by its rehiring of Peters after he was ousted from office and its rehiring of Davis after DHS issued a finding of four "founded" charges of sexual abuse and mo-

lestation of school children. In turn, the complaint alleged, the DHS investigations into nine alleged incidents of sexual abuse showed Davis's "pattern" of engaging in such conduct and the corresponding "notice" to the Board of the existence of such conduct.

The board members' and administrators' "actual notice" of these incidents are the basis for Doe's individual capacity claims. That is, she alleges that because each and every defendant named knew about the DHS investigations, their failure to remove Davis from student contact and their decision to rehire him for 1990–91 show a deliberate indifference to her constitutional rights.

Following defendants' motions for summary judgment, or in the alternative, motions to dismiss, the district court dismissed Doe's claim in a series of three orders. First, the district court dismissed Doe's section 1983 claims against all defendants on the grounds that it "perceive[d no] basis on which a reasonable trier of fact could find that the defendants county, school board, board members, superintendents, and the principal Mr. Bundren showed deliberate indifference to any deprivation" of plaintiff's rights. The court preliminarily determined, however, that Doe's right to be free from sexual abuse at the hands of a public school teacher was clearly established and that the school "had a clearly established duty to a public school student like Jane Doe to protect her from a violation of her liberty interest in freedom from sexual abuse."

The court reasoned that Doe's claims should be dismissed nevertheless because the defendants were "entirely objectively reasonable" in concluding that the "pre-trial agreement" entered into by Davis and DHS "exonerated" Davis of the allegations made against him. Additionally, the court concluded, the individual defendants appropriately depended on the superintendents to advise them on the conclusions reached by DHS; they did not have an independent duty to investigate each and every allegation.

The court rejected plaintiff's argument that the School Board had a "custom" of ignoring the pattern of misconduct of its employees. Doe alleged that evidence of the "custom" was the School Board's decision to rehire Peters and Davis despite several alleged improprieties. However, none dealt with sexual abuse. Doe's claim was that the School Board maintained a "good old boys" network," which she claimed was supported by the following facts: that Peters was ousted from public office for knowingly and willingly misapplying public funds, *see State ex rel. Estep v. Peters,* 815 S.W.2d 161 (Tenn. 1991); that Peters had violated the civil rights of two Claiborne County School System employees, *see Bundren v. Peters,* 732 F.Supp. 1486 (E.D.Tenn.1989); that Peters may have used a school credit card to pay for prostitute services; and that Davis was rumored to have gambled and committed financial improprieties as the director of a civic center. The court concluded that even if the allegations regarding Peters are accepted as true, they are not "evidence of anyone's proclivity to commit sexual molestation of public school students or to be deliberately indifferent to such molestation." The court thus concluded that all defendants sued in their individual capacities were entitled to "good faith immunity." The court also dismissed all the claims brought under the Tennessee Governmental Tort Liability Act on the grounds that defendants' conduct was not willful, wanton, or grossly negligent. Doe has not appealed that decision to this court.

With respect to Doe's Title IX claim, the court first dismissed the County as a proper party on the basis that the term "local educational agency," as the term is used in 20 U.S.C. § 1687(2)(B), does not include the County.

The court's decision to dismiss the Title IX claim against the School Board was tied to its previous decision to exclude all of plaintiff's "knew or should have known" evidence from trial. As a result of defendants' motions *in limine,* the court excluded, *inter alia,* any and all allegations of sexual abuse made against Davis by any person other than Doe; any DHS correspondence; any reference to Davis's *Alford* plea to the statutory rape charge; and any evidence of a "good old boys" network. Having excluded all this evidence, the court concluded that Doe could not state a claim under Title IX because Title VII agency principles do not apply to Title

IX actions; that is, vicarious liability, in the absence of notice, is not available as part of a supervisory hostile environment cause of action under Title IX. In reaching this decision, the district court relied on the sole district court case to have so concluded, *Floyd v. Waiters,* 831 F.Supp. 867 (M.D.Ga. 1993). With all her causes of action dismissed, except those against Davis, plaintiff voluntarily dismissed the remaining claims to facilitate this appeal.

## II.

### A.

■ This case presents several important issues of first impression: the scope of municipal liability under 42 U.S.C. § 1983 for its failure to act in a teacher-student sexual abuse case; the scope of a school administrator's liability, sued in his individual capacity, for his alleged failure to prevent a student's sexual abuse at the hands of a school employee; and the elements of a cause of action against a public school for sexual harassment under Title IX. We decide these issues of law *de novo.*

■ We review grants of summary judgment *de novo* using the same test used by the district court. *Brooks v. American Broadcasting Cos.,* 932 F.2d 495, 500 (6th Cir.1991). Under Fed.R.Civ.P. 56(c), summary judgment is proper if, viewing all the evidence before the district court in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988) (quoting Fed.R.Civ.P. 56(c)); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

■ Summary judgment is proper only when "the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party." *Cox v. Kentucky Dep't of Transp.,* 53 F.3d 146, 150 (6th Cir.1995). In this context, "a party may rely upon circumstantial and inferential evidence to defeat a ... summary judgment motion." *Id.* at 151.

### B.

We first address the dismissal of Doe's section 1983 claim against the County and the School Board. Although plaintiff seems to be unclear about the principles governing her claim, she apparently advances two theories to support her municipal liability cause of action. First, she argues that the School Board had a custom or policy of inaction toward the pattern of misconduct of its employees and that such inaction showed a deliberate indifference to Doe's constitutional rights. Doe seems to argue that the School Board's "custom" or "policy" of having what she labels a "good old boys network" resulted in her abuse by Davis.

Second, plaintiff asks this court to extend *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 1004, 103 L.Ed.2d 249 (1989), to reach the conduct alleged in this case by holding that Tennessee's *in loco parentis* statute creates a "special relationship" between Doe and the school. If such "special relationship" exists, the substantive component of the Fourteenth Amendment's Due Process Clause imposes upon the school a constitutional duty to protect her against the sexual abuse by a school employee. For the reasons that follow we reject these arguments and affirm the dismissal of plaintiff's section 1983 claim against the County and the School Board. We do so, however, on grounds other than those advanced by the district court. *Herm v. Stafford,* 663 F.2d 669, 684 (6th Cir.1981).

### 1.

■ A plaintiff can bring a claim under section 1983 when she is deprived "of any rights, privileges, or immunities secured by the Constitution and laws," as a result "of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. A municipal liability claim against the County and the School Board must be examined by applying a two-pronged inquiry:

(1) Whether the plaintiff has asserted the deprivation of a constitutional right at all; and

(2) Whether the County and/or the School Board is responsible for that violation.

*See Collins v. City of Harker Heights,* 503 U.S. 115, 120, 112 S.Ct. 1061, 1065–66, 117 L.Ed.2d 261 (1992). For liability to attach, both questions must be answered in the affirmative.

The threshold determination, therefore, is whether the sexual abuse perpetrated against Doe amounts to a constitutional violation. We answer this question by examining the nature of the right claimed to have been infringed upon: the right to be free from sexual abuse at the hands of a state actor, which right is clearly embraced by the more general right to personal security and to bodily integrity. We treat these questions as one.

■ The right to personal security and to bodily integrity bears an impressive constitutional pedigree. As far back as 1891, the Supreme Court recognized that "[n]o right is held more sacred, or is more carefully guarded ... than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891). The Court has subsequently recognized the constitutional standing of such a right in a variety of contexts. In *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977), the Court declared that "[a]mong the historic liberties" protected by the Due Process Clause is the right against "unjustified intrusions on personal security" at the hands of the state. *See also Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In *Albright v. Oliver,* 510 U.S. 266, 271–73, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994), the Court stated that "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."

Following this long tradition, this court, too, has recognized the importance of this right. We held that children have a substantive due process right to be free from infliction of harm in state-regulated foster homes,

*Meador v. Cabinet for Human Resources,* 902 F.2d 474, 476 (6th Cir.), *cert. denied,* 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990), and that "[i]t is well established that persons have a fourteenth amendment liberty interest in freedom from bodily injury," *Webb v. McCullough,* 828 F.2d 1151, 1158 (6th Cir. 1987). In *Poe v. Haydon,* 853 F.2d 418, 429–30 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989), we recognized that the right to be free of invidious sex discrimination at the hands of the state was clearly established.

Although we have never addressed the precise factual situation presented to us here, every court of appeals that has had the opportunity to consider the issue has logically recognized that the right to be free from sexual abuse at the hands of a public school teacher is clearly protected by the Due Process Clause of the Fourteenth Amendment. For example, in *Stoneking v. Bradford Area School District,* 882 F.2d 720, 726 (3d Cir. 1989), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990), the Third Circuit stated that "[i]t may seem ludicrous to be obliged to consider whether it was 'clearly established' that it was impermissible for school teachers and staff to sexually molest students." And, the Fifth Circuit concluded that "[i]t is incontrovertible that bodily integrity is necessarily violated when a state actor sexually abuses a schoolchild." *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 451 (5th Cir.) (*en banc*), *cert. denied,* —— U.S. ——, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994). *See also Abeyta v. Chama Valley Indep. Sch. Dist.,* 77 F.3d 1253, 1255 (10th Cir.1996).

[6] Upon consideration, we hold that a schoolchild's right to personal security and to bodily integrity manifestly embraces the right to be free from sexual abuse at the hands of a public school employee. The substantive component of the Due Process Clause protects students against abusive governmental power as exercised by a school. *See Howard v. Grinage,* 82 F.3d 1343, 1349 (6th Cir.1996). To be sure, the magnitude of the liberty deprivation that sexual abuse inflicts upon the victim is an abuse of governmental power of the most fundamental sort;

it is an unjustified intrusion that strips the very essence of personhood. If the "right to bodily integrity" means anything, it certainly encompasses the right not to be sexually assaulted under color of law. This conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause.

Our holding in *United States v. Lanier*, 73 F.3d 1380 (6th Cir.1996) (*en banc*), cert. granted, ⸺ U.S. ⸺, 116 S.Ct. 2522, 135 L.Ed.2d 1047 (1996), is not to the contrary. In *Lanier*, we stated that neither this circuit nor the Supreme Court had explicitly held that the "right to be free from rape and sexual assault and harassment" was "a component of an enforceable general constitutional right to 'bodily integrity.'" *Id.* at 1388. This is no doubt a true statement. The Supreme Court has never so held; and until today, this court has not had the opportunity to consider the question. In any case, *Lanier*'s reasoning on this issue is of limited applicability in the civil context, where the constitutional concerns underlying the *Lanier* decision are simply nonexistent.

In *Lanier*, we were concerned with the constitutional implications of a vaguely worded federal criminal statute, which criminalized "the wilful 'deprivation of any rights ... protected by the Constitution' committed by any person under 'color of any law.'" *Id.* at 1382. We held only "that sexual assaults may not be prosecuted as violations of a constitutional substantive due process right to bodily integrity." *Id.* at 1393. We reasoned that the absence of specific case law defining the constitutional crime with which the government charged Lanier violated the fundamental requirements that criminal statutes " 'be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties....'" *Id.* at 1389 (citation omitted). The absence of precedent specifically holding that the type of conduct in which Lanier engaged was the type of behavior that could subject someone to criminal liability, clearly implicated due process limitations, *ex post facto* considerations, the danger of arbitrary judgments, and a variety of other constitutional concerns.

Claims under section 1983 simply do not present these types of concerns. We therefore hold that Doe had a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity, that such right is fundamental, and that Davis's sexual abuse of Doe violated that right.

◼ Having answered the first question in the affirmative, we consider next whether the municipal defendants are responsible for that violation. Doe cannot base her claim against the County and the School Board solely on Davis's conduct, for *respondeat superior* is not available as a theory of recovery under section 1983. *Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Rather, she must show that the School Board *itself* is the wrongdoer. *Collins*, 503 U.S. at 122, 112 S.Ct. at 1067. Under *Monell*, the County and the School Board cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right. *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–36. Doe does not assert that her sexual abuse resulted from an officially enacted policy. Rather, she claims that section 1983 liability exists due to a "custom," which, although not officially adopted or established through the decision-making channels, led to Davis sexually abusing her. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 121, 108 S.Ct. 915, 922–23, 99 L.Ed.2d 107 (1988).

◼ A "custom" for purposes of *Monell* liability must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036 (internal quotation marks and citation omitted); *see also Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir.), cert. denied, 510 U.S. 826, 114 S.Ct. 90, 126 L.Ed.2d 57 (1993). In turn, the notion of "law" must include "[d]eeply embedded traditional ways of carrying out state policy." *Nashville, Chattanooga & St. Louis*

*Ry. Co. v. Browning,* 310 U.S. 362, 369, 60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940). It must reflect a course of action deliberately chosen from among various alternatives. *City of Oklahoma v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). In short, a "custom" is a "legal institution" not memorialized by written law. *Feliciano,* 988 F.2d at 655.

■ In addition to showing that the School Board as an entity "caused" the constitutional violation, plaintiff must also show a direct causal link between the custom and the constitutional deprivation; that is, she must "'show that the particular injury was incurred *because* of the execution of that policy.'" *Garner v. Memphis Police Dep't,* 8 F.3d 358, 364 (6th Cir.1993) (emphasis added) (citation omitted), *cert. denied,* 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). This requirement is necessary to avoid *de facto respondeat superior* liability explicitly prohibited by *Monell.*

■ The analytical difficulty in this case stems from the type of "custom" that the plaintiff claims directly caused Davis to sexually abuse her. Doe does not claim that the School Board had a custom of affirmatively condoning sexual abuse. Clearly, no municipality could have such a policy. Rather, Doe claims that the custom was to *fail to act* to prevent the sexual abuse.

■ To state a municipal liability claim under an "inaction" theory, Doe must establish:

(1) the existence of a clear and persistent pattern of sexual abuse by school employees;

(2) notice or constructive notice on the part of the School Board;

(3) the School Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and

(4) that the School Board's custom was the "moving force" or direct causal link in the constitutional deprivation.

*See City of Canton v. Harris,* 489 U.S. 378, 388–89, 109 S.Ct. 1197, 1204–05, 103 L.Ed.2d 412 (1989); *see also Thelma D. v. Board of Educ. of City of St. Louis,* 934 F.2d 929, 932–33 (8th Cir.1991). The *Monell* custom requirement is an essential element of this claim. The evidence must show that the need to act is so obvious that the School Board's "conscious" decision not to act can be said to amount to a "policy" of deliberate indifference to Doe's constitutional rights. *City of Canton,* 489 U.S. at 389, 109 S.Ct. at 1205. "Deliberate indifference" in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to sexual abuse.

The evidence Doe advanced does not show that the School Board, as an official policy-making body, had a "custom" that reflected a deliberate, intentional indifference to the sexual abuse of its students. It may be freely conceded that the board members, individually, might have been recklessly passive in the performance of their duties. One could even argue that they were reckless in their failure, collectively, to inquire further into the allegations lodged against Davis and/or to clarify the results of the DHS investigation. It cannot be said, however, that their failure to act in Davis's case was the direct result of a custom in the sense that the School Board consciously never acted when confronted with its employees' egregious and obviously unconstitutional conduct. The delegation to DHS to initiate an investigation was appropriate. Reliance on the superintendent's recommendation for rehiring was likewise appropriate. Their failure independently to investigate further is simply not "board action" and certainly does not amount to a custom on which constitutional tort liability may be affixed.

Because the failure to present sufficient evidence to establish the existence of a policy of inaction ends the inquiry, we express no view on whether, if such custom had been established, the inaction of the School Board would have amounted to deliberate indifference. There is an analytical distinction between being deliberately indifferent as to one particular incident, and having a "policy" of always being deliberately indifferent to unconstitutional actions. A municipality could

be found to have a policy of failing to act in the face of repeated constitutional violations. But it could also be found to have acted reasonably, or even negligently, in a particular case, thus precluding liability.

The district court did not consider whether Doe presented sufficient evidence from which the existence of a custom or policy could be inferred as an initial matter. The court *assumed* that such policy existed and proceeded to analyze whether the defendants had been "deliberately indifferent." Just as the existence of a constitutional right must be the threshold determination in any section 1983 claim, the finding of a custom or policy is the initial determination to be made in any municipal liability claim. If a plaintiff advances sufficient evidence to create a genuine issue of material fact as to the existence of such custom or policy, then the question of "deliberate indifference" is one for the jury to decide and not for the court at the summary judgment stage. *See Hicks v. Frey,* 992 F.2d 1450, 1456–57 (6th Cir.1993).

 if what Doe labels as "good old boys network" evidence were sufficient to state a claim, which we hold it is not, she would still fail to meet the essential causation requirement for section 1983 liability to attach. Obedience to the rule that *respondeat superior* liability does not attach to a municipality requires that we carefully scrutinize the causation element of Doe's claim that she was a victim of the School Board's "custom" of inaction; that is, her claims that the School Board routinely acquiesced to the misbehavior of its employees in order to protect its "good old boys." She points to evidence that Peters was ousted from office, among other things, for misappropriating funds, and also asserts that the School Board knew that Davis had gambling problems. She argues that a "custom" of a "good old boys network" existed because, even in the face of this evidence, the School Board re-hired both Peters and Davis. Even taking this evidence at face value and assuming that these two isolated incidents amounted to a "policy" in the *Monell* sense, there is no direct causal connection between such policy and the sexual abuse inflicted by Davis.

██ We have no occasion to decide here whether a different quantum of evidence might support an action against a school board in a different context; we hold that, in this case, the evidence presented simply does not amount to a custom of tacit authorization of sexual abuse or obvious deliberate indifference to Doe's constitutional rights. We will affirm the dismissal of Doe's section 1983 claim against the School Board. We will also dismiss the claim against the County because Doe failed to articulate or plead a policy attributable to it. The conclusory statement that she is suing the County "by and through" the Claiborne County Board of Education simply does not state a claim under section 1983.

██ We will also affirm the dismissal of the official capacity claims against Widener, Dobbs, and Bundren because a suit against an official of the state is treated as a suit against the municipality. *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985). Widener, Dobbs, and Bundren are therefore entitled to judgment as a matter of law.

### 2.

Alternatively, Doe asks this court to hold as a matter of law that under *DeShaney,* 489 U.S. at 197, 109 S.Ct. at 1004, the School Board had a constitutional duty to protect her from Davis's sexual abuse, which duty arises as a result of the "special relationship" created between her and the school district by Tennessee's *in loco parentis* statute. The existence of this duty does not depend upon a finding of a custom or policy.

*DeShaney* involved a child who had been severely beaten by his father, as a result of which the child suffered brain damage. The child's mother had complained on repeated occasions to the Department of Social Services, which took some steps to protect the child, but failed to remove him from his father's custody. The mother brought suit under section 1983, claiming that the state had an "affirmative constitutional duty" to protect her son from the abuse of his father. *Id.* at 193–94, 109 S.Ct. at 1002. The Court held that the government had no substantive due process duty to protect a child not in

state custody from physical abuse by his father, a private actor over whom it had no control. *Id.* at 201, 109 S.Ct. at 1006. In reaching this conclusion, the Court distinguished the situation in which the Due Process Clause *does* impose an affirmative duty on the state to act to protect the security of persons within its control. *Id.* at 200, 109 S.Ct. at 1005–06. The Court held that where the state imposes limitations on an "individual's freedom to act on his own behalf— through incarceration, institutionalization, or other similar restraint of personal liberty," the substantive component of the Due Process Clause "imposes upon it a corresponding duty to assume responsibility for his safety and general well-being." *Id.*

In contrast, the Constitution imposes no duty on the state to protect individuals from the harm suffered at the hands of a "private" actor, especially where "it played no part in [the creation of the danger], nor did it do anything to render him any more vulnerable to [it]." *Id.* at 201, 109 S.Ct. at 1006. Thus, the type of "special relationship" that makes a constitutional claim viable involves state custody or control.

We recently decided a case involving the "special relationship" concept and the concomitant "duty" of a school to its students, *Sargi v. Kent City Bd. of Educ.,* 70 F.3d 907 (6th Cir.1995). We held that compulsory attendance laws do not create a "special relationship" between school districts and their students that give rise to an "affirmative duty" on the part of the school to protect its students while riding a school bus. *Id.* at 911. *Sargi* involved a section 1983 action against a school board and several of the school administrators resulting from the death of a female student in a school bus due to heart failure. Plaintiff argued that there was a "special relationship" between the school and the decedent that gave rise to a constitutional duty to protect her constitutional rights, and that the school breached that duty by failing to protect her rights *Id.* at 910. The *Sargi* court rejected this theory.

The court held that under the particular facts of the case, there was no "special relationship" that gave rise to a constitutional duty on the part of the school board to

protect students from the consequences of a seizure while on a school bus. *Id.* at 911. The court explicitly stated: "We do not hold that school districts have no duty of protection of students in other situations not before us. The nature and extent of such duties will have to be decided case by case." *Id.*

 Although, clearly, a school system has an unmistakable duty to create and maintain a safe environment for its students as a matter of common law, its *in loco parentis* status or a state's compulsory attendance laws do not sufficiently "restrain" students to raise a school's common law obligation to the rank of a *constitutional* duty. Other circuits that have considered the question have reached the same conclusion. *See, e.g., Dorothy J. v. Little Rock Sch. Dist.,* 7 F.3d 729, 732 (8th Cir.1993); *Maldonado v. Josey,* 975 F.2d 727, 732–33 (10th Cir.1992), *cert. denied,* 507 U.S. 914, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993); *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1372–73 (3d Cir.1992) (*en banc*), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); *J.O. v. Alton Community Unit Sch. Dist.,* 909 F.2d 267, 272–73 (7th Cir.1990). The Due Process Clause, while serving as an essential vehicle to the vindication of a state's abridgment of fundamental aspects of life, liberty, and property, does not impose absolute constitutional liability on a state. Were this not the case, the most trivial of common law torts would rise to the level of a constitutional violation.

 Although the facts of this case are tragic and we are deeply disturbed by Davis's sexual abuse of Doe, the limitations of our judicial authority do not permit us to provide the relief Doe seeks. We follow, as we must, the clear rule of *DeShaney* and its progeny and conclude that Tennessee's *in loco parentis* statute does not create a "special relationship" between Doe and the School Board, and therefore the Due Process Clause does not impose an affirmative constitutional duty on the School Board to assume the responsibility of protecting its students against the unconstitutional acts of its employees.

## III.

We address next Doe's individual capacity claims. As noted above, Doe sued seven defendants in their individual capacities making the same argument she offered to support her municipal liability claims: that the individual board members and school administrators were deliberately indifferent to the deprivation of her constitutional rights. She claims that the defendants' inaction should subject them to liability.

As with the claims discussed above, our resolution of this issue must begin with the preliminary determination of whether Doe has stated a claim under section 1983 against each individual defendant. As an initial matter, Doe must show that

(1) she was deprived of a right secured by the Constitution; and that

(2) such deprivation occurred under color of state law.

42 U.S.C. § 1983. We have already concluded that she has satisfied the first requirement. The second, however, requires us to determine which state actors can be held responsible for the constitutional injury caused directly by someone other than those sought to be held accountable. We have already implicitly held that Davis was a state actor and that therefore the constitutional injury occurred under color of law. However, Doe seeks to hold the board members, the superintendent, and SMMS's principal, not Davis, liable.

The so-called "supervisory liability" test we established in *Bellamy v. Bradley*, 729 F.2d 416 (6th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984), provides an incomplete approach to the resolution of the claims against Burchette, Williams, Ellis, and J.P. Barnard. Under the title of "DEROGATION OF *DUTIES* BY PRISON OFFICIALS" we held that

> [the section] 1983 liability of supervisory personnel must be based on more than the right to control employees. Section 1983 liability will not be imposed solely upon the basis of *respondeat superior.* There must be a showing that the supervisor encouraged the specific incident of misconduct or

in some other way directly participated in it.

*Id.* at 421 (emphasis added). "At a minimum," we held, a "plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* This holding followed section 1983's requirement that the person sought to be held accountable actually have "caused" the deprivation, and was based on the fact that the individual defendants had supervisory responsibilities.

Here, the individual board members had no individual supervisory responsibilities other than those imposed on the School Board as a whole. Although the School Board can act as an entity, and indeed as a governing body it has the statutory duty to supervise school personnel, *see* TENN.CODE ANN. § 49–2–202 & 203, the individual School Board members cannot "act" independently. Liability for a failure to act necessarily implies a "duty" to carry out the action the person is accused of derogating. Under Tennessee law, "[t]he duties of the school board are imposed on the entire board and not on individual members." *State ex rel. Thompson v. Walker*, 845 S.W.2d 752, 759 (Tenn.Ct. App.1992). This is not to say that constitutional liability is determined solely by resorting to state law definitions of duty. However, it provides a starting point of analysis, for constitutional tort liability on the basis of inaction must derive from some identifiable source of duty. We think the relevant question for purposes of section 1983 liability in this context is whether the duty to have taken some action is of such a nature that the individual's inaction will render him responsible for the constitutional harm. *See Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402, 1408–09 (5th Cir.1995).

The Due Process Clause " 'does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society.' " *Id.* (quoting *Collins*, 503 U.S. at 128, 112 S.Ct. at 1070). Although constitutional line-drawing is no doubt always problematic, it remains clear that not every tort rises to the level of a constitutional violation;

thus, some threshold standard must define the conduct that falls on either side of the line.

▇ Because section 1983 has a "color of law" requirement, a board member can be held liable only if state law, whether provided by statute or judicially implied, empowers him with some legal obligation to act. *See Rains County*, 66 F.3d at 1411. A "duty" under "color of law" must be a distinct element of a section 1983 case alleging a "failure to act." That is, a plaintiff must show that an individual defendant failed to act under color of law. *See id.* If state law does not impose a duty to take action, "there is no conduit through which an exercise of state power can be said to have caused the constitutional injury." *Id.* at 1416.

▇ Defendants' positions as board members, without more, cannot be the basis for the existence of this element; "a person does not act under color of state law solely by virtue of [his] relationship to the state," instead, liability depends on the nature of his conduct. *Id.* at 1411 (citing *Polk County v. Dodson*, 454 U.S. 312, 319–20, 102 S.Ct. 445, 450–51, 70 L.Ed.2d 509 (1981)). The absence of an identifiable duty would leave a malleable and elusive standard of conduct to which officials should conform their actions, rendering the causal connection between the omission and the deprivation far too abstract to impose section 1983 liability. This result is not reasonably obtainable under the plain language of section 1983.

▇ We conclude that to state a claim for a failure to act when the alleged wrongdoer is not a supervisory government official, a plaintiff must separately establish the "color of law" requirement of section 1983 by identifying some cognizable duty that state or federal law imposes upon the alleged "enactor." In the absence of a duty there is no section 1983 liability because the failure to act cannot be said to have occurred under color of law.

Doe has failed to articulate what she expected the individual board members to do. Both in her brief and at oral arguments, her counsel simply asserted that the defendants were deliberately indifferent to her constitutional rights. Such assertion simply does not state a claim under section 1983. As a starting matter, none of the defendants in this case had any knowledge of Davis's abuse of Doe. Thus Doe's claim cannot be based on the fact that defendants failed to report Davis's sexual abuse of her. Alternatively, her assertions, although wholly unclear, seem to imply that the individual board members should not have voted to rehire Davis for the 1990–91 school year due to the results of the DHS investigation that took place in 1990. Certainly, the School Board could have voted not to rehire him. However, this discretionary decision, on the basis of the evidence they had before them at the time, does not begin to articulate the source of their duty to have done otherwise. Neither Burchette, nor Williams, nor Ellis, nor J.P. Barnard could have "acted" independently of the School Board to prevent Davis's rehiring. These School Board members simply have no individual supervisory responsibilities. To create the legal fiction that such supervisory responsibility exists solely by virtue of serving as a member of an official body is to ignore the reality that these board members were unable to act, in a legal sense, except as constituent members of a board majority. We think the "color of law" requirement of section 1983 requires more than what plaintiff has alleged here.

We have no occasion to consider whether there is some yet unpleaded obligation for an individual board member affirmatively to act, for example, to inform the School Board as a whole, in the face of known violations of a student's constitutional rights, and whether the failure to act in such circumstances might subject him to section 1983 liability. But we hold that in this case, for the reasons we have explained, Doe has failed to state a claim against Burchette, Williams, Ellis, and J.P. Barnard in their individual capacities. Because on these facts plaintiff cannot maintain a federal cause of action against these defendants, we have no need to reach the question of qualified immunity, the grounds on which the district court disposed of this claim.

▇ As to former superintendent Peters, current superintendent Norris, and principal

Lynn Barnard, we hold that "supervisory liability" standards apply to resolve the claim against them and conclude that the claim should likewise be dismissed without reaching the question of qualified immunity.

These three defendants had a statutory duty to supervise Davis and to take independent action for reported acts of misconduct. They clearly did so. They reported the allegations to DHS, they removed Davis from student contact, and Barnard closely supervised Davis due to his concerns about past incidents of alleged child abuse. Norris had Barnard call DHS to make certain that Davis had been "exonerated" of all previous charges. Peters was ousted from office in 1990 and was not in the position to vote for the rehiring of Davis at the 1990 board meeting. Whatever he did, or failed to do prior to that time, cannot be causally connected to the abuse of Doe.

It may be freely conceded that the actions of these individuals left a lot to be desired. They may have been sloppy, reckless, or neglectful in the performance of their duties. But that is not enough for section 1983 liability under the precedent laid down in *Bellamy*, 729 F.2d 416, and *Barber v. City of Salem*, 953 F.2d 232 (6th Cir.1992). A plaintiff must show that, in light of the information the defendants possessed, the teacher who engaged in sexual abuse "showed a strong likelihood that he would attempt to" sexually abuse other students, such that the "failure to take adequate precautions amounted to deliberate indifference" to the constitutional rights of students. *See id.* at 240. *Bellamy* presents but another way of analyzing this claim; whether defendants' conduct amounted to a tacit authorization of the abuse. *Bellamy*, 729 F.2d at 421.

Defendants here were simply not confronted with such a widespread pattern of constitutional violations that their actions or inactions amounted to a deliberate indifference to the danger of Davis sexually abusing students. The steps they did take, and even those they failed to take and arguably should have taken, do not show that they "encouraged the specific incident of misconduct or in some other way directly participated in it." *Id.* Nor did they authorize, approve, or knowingly acquiesce in Davis's unconstitutional conduct. *Id.* They had no knowledge, constructive or otherwise, that Davis was abusing Doe. We therefore affirm the dismissal of the claims against Peters, Norris, and Lynn Barnard on grounds other than those stated by the district court.

**IV.**

■■■ Doe also asserted a claim against the School Board on the basis of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88. She claims that Davis's sexual abuse amounts to sexual harassment under the statute subjecting the School Board to liability. Section 1681 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681. The preliminary issues are uncontroversial. It is unquestionable that Doe has a private right of action under Title IX, *see Cannon v. University of Chicago*, 441 U.S. 677, 688–89, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979), for both injunctive relief and monetary damages. *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 72–73, 112 S.Ct. 1028, 1036–37, 117 L.Ed.2d 208 (1992). Further, the "discrimination" prohibition of Title IX encompasses the sexual harassment of a student by a teacher. *Id.* at 75, 112 S.Ct. at 1037–38.

■■■ Moreover, the Civil Rights Restoration Act of 1987 expanded the scope of Title IX. *See* 20 U.S.C. § 1687(2)(A). The Act reads:

The Congress finds that—(1) certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of title IX ... and (2) legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered.

20 U.S.C. § 1687 (hist. and stat. notes). Thus, Title IX's application should be accord-

ed " 'a sweep as broad as its language.' " *See North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 1918, 72 L.Ed.2d 299 (1982) (citation omitted).

 The issue we must decide is one of first impression in this circuit: whether Title VII agency principles apply to sexual harassment cases brought under Title IX. Because Title VII sexual harassment and sexual discrimination principles have been so well litigated, while Title IX has a short historical parentage, courts have and do resort to Title VII standards to resolve sexual harassment claims brought under Title IX. *See, e.g., Davis v. Monroe County Bd. of Educ.,* 74 F.3d 1186 (11th Cir.1996); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243 (2d Cir.1995); *Preston v. Commonwealth of Virginia ex rel. New River Community College,* 31 F.3d 203 (4th Cir.1994); *Lipsett v. University of Puerto Rico,* 864 F.2d 881 (1st Cir.1988). This practice implicitly received the Supreme Court's approval in *Franklin.*

*Franklin* involved a hostile environment sexual harassment claim by a student against a public school. The student alleged that a teacher coerced her into having intercourse and that the school had ignored her complaints. *Franklin,* 503 U.S. at 63–64, 112 S.Ct. at 1031–32. The Court held that hostile environment claims are cognizable under Title IX and adopted Title VII principles to reach that conclusion:

> Unquestionably, Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64 [106 S.Ct. 2399, 2404, 91 L.Ed.2d 49] [ (1986) ]. We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe.

*Id.* at 75, 112 S.Ct. at 1037. By citing *Meritor Savings Bank,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49, a Title VII hostile environment case, the Court indicated that it views with approval the application of Title VII principles to resolve similar Title IX cases.

Both Title IX's legislative history and the regulations enacted pursuant to it amply support this approach. The House Report on Title IX states that "Title VII ... specifically excludes educational institutions from its terms. [Title IX] would remove that exemption and bring those in education under the equal employment provision." 1972 U.S.C.C.A.N. 2462, 2512. And, the regulations define a "recipient" as

> any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, *or any person,* to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or *activity* which receives or benefits from such assistance, including any subunit, successor, assignee, or transferee thereof.

34 C.F.R. § 106.2(h) (emphasis added). Finally, although not having the force of law, the Office for Civil Rights, the agency charged with enacting regulations under Title IX, has articulated that Title VII agency principles should apply to Title IX cases. It defined sexual harassment under Title IX as "consist[ing] of verbal or physical conduct of a sexual nature, imposed on the basis of sex, by an employee or *agent* of a recipient that denies, limits, provides different, or conditions the provision of aid, benefits, services or treatment protected under Title IX." OF-FICE FOR CIVIL RIGHTS, U.S. DEP'T OF EDUC., SEXUAL HARASSMENT: IT'S NOT ACADEMIC 2 (1988) (emphasis added) (citing OCR Policy Memorandum from Antonio J. Califa, Director for Litigation, Enforcement and Policy Service, OCR, to Regional Civil Rights Directors (Aug. 31, 1981)).

There is ample authority to support our conclusion that Title VII agency principles apply to resolve discrimination claims brought under Title IX. We find the district court's reliance on the sole district court decision to have concluded to the contrary, *see Floyd,* 831 F.Supp. 867, to be in error. We remand this case to the district court for

an application of Title VII standards to plaintiff's sexual harassment claim. In doing so, we express no view on the merits of her claim.

■■■ To guide the district court upon remand, we clarify the following principles. First, a "hostile environment" sexual harassment claim is cognizable under Title IX. *See Franklin,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208; *Meritor Sav. Bank,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49. Second, the elements to state a supervisory hostile environment claim under Title VII equally apply under Title IX. *See Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796 (6th Cir.1994); *see also Kauffman v. Allied Signal, Inc.,* 970 F.2d 178 (6th Cir.), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992); *Poe v. Haydon,* 853 F.2d 418 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989). Finally, whether conduct about which a plaintiff complains created a "hostile environment" under Title IX, and whether the educational entity took appropriate action after knowing of inappropriate conduct, are factual questions for the jury to resolve. *Mann v. University of Cincinnati,* 864 F.Supp. 44, 46 (S.D.Ohio 1994).

## V.

■■■ The final issue we address is the challenge to the district court's decision to exclude all of Doe's notice evidence on the basis of Rule 403 of the Federal Rules of Evidence. A district court's evidentiary balancing under Rule 403 is a decision this court reviews for abuse of discretion. *Doe v. Sullivan County,* 956 F.2d 545, 559 (6th Cir.), *cert. denied,* 506 U.S. 864, 113 S.Ct. 187, 121 L.Ed.2d 131 (1992).

■■■ Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R.Evid. 403. "Unfair prejudice" means the *undue* tendency to suggest a decision based on improper considerations; it "does not mean the damage to a defendant's case that

results from the legitimate probative force of the evidence." *United States v. Bonds,* 12 F.3d 540, 567 (6th Cir.1993) (internal quotation marks and citations omitted). Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993).

■■■ Where a decision to exclude evidence on the basis of Rule 403 is overly restrictive such that it precludes a plaintiff from the full opportunity to present his case to a jury, it will be deemed an abuse of discretion. *See West v. Philadelphia Elec. Co.,* 45 F.3d 744, 748 (3d Cir.1995).

■■■ We hold that it was an abuse of discretion to exclude an entire category of evidence crucial to plaintiff's claim at the pretrial stage. Apparently, the district court did not even consider the probative value of the proffered notice evidence, the alternative of a jury instruction, or the alternative of ruling on the admissibility of the evidence as the testimony developed in the case. The court, in essence, precluded plaintiff from establishing the elements of three of her causes of action on the basis that the evidence was unfairly prejudicial to the defendants. Offering little analysis for this conclusion, the court's ruling indicates that it may not have appreciated the nature of the evidence and the purpose for which plaintiff was offering it.

The "notice" evidence Doe sought to introduce does not have an *undue* tendency to suggest a decision on an improper basis as that term is understood under the rule, nor is it related to a collateral matter, nor is it cumulative. What the defendants knew, and when they knew it, is evidence upon which a material issue in this case hinges. That this evidence logically casts the defendants in an unfavorable light is not, *ipso facto,* a reason to exclude it. All evidence presented by a party opponent, is prejudicial to the other side, to a greater or lesser degree. The relevant question is whether its probative

value is *substantially* outweighed by its danger of unfair prejudice. This inquiry the court failed to pursue. We therefore reverse the decision to exclude the evidence on the basis of Rule 403.

## VI.

For the reasons explained, we **AFFIRM** the dismissal of all section 1983 claims, **REVERSE** the decision dismissing plaintiffs' Title IX claim, **REVERSE** the decision to exclude the evidence on the basis of Rule 403, and **REMAND** with instructions that the district court proceed in a manner not inconsistent with this opinion.

ALAN E. NORRIS, Circuit Judge, concurring in part, dissenting in part.

I respectfully dissent from the holding found in Part II of the majority opinion, that plaintiff enjoyed a clearly established fundamental substantive due process right "to personal security and to bodily integrity." I question the wisdom of the majority in placing this court on record as saying that commission of a state law sexual assault crime amounts to a constitutional tort under 42 U.S.C. § 1983. Furthermore, that holding runs contrary to this court's discussion of the question in *United States v. Lanier,* 73 F.3d 1380, 1388–89 (6th Cir.1996) (en banc).

It follows, then, that I concur in Parts II and III of the opinion to the extent that the majority affirms the dismissal of claims brought under 42 U.S.C. § 1983.

I concur in the balance of the opinion.